# CHARLESTON.

McCANDLESS, J. B. & S. *v.* WARNER, *et al.*

Submitted June 19, 1885.—Decided November 14, 1885.

1. If a party obtain a deed for property, for which he has paid a valuable consideration, and if sec. 7 of the English statute of frauds substantially exists in this State, although in terms it is omitted from our statute, it may be shown, that such party holds the property so conveyed in trust for another. (p. 780.)

2. Such trust need not be created in writing but must be manifested and proved in writing by the party enabled by law to declare the trust ; and such writing must show both the existence of the trust and the terms thereof. (p. 780.)

3. The writing to prove such trust need not be made at the time the trust is created, but may be made at any time thereafter, and it is

not necessary that it be addressed to the *cestui que trust* or to any other person.    (p. 780.)

4. Letters written to any one after the creation of the trust, in which the trust and the terms thereof are admitted and disclosed, are a sufficient declaration of such trust within the statute.    (p. 780.;

5. It is not necessary, that the trust and the terms thereof shall all appear in one letter or other writing, but if they can be ascertained with reasonable certainty from a number of letters or or from one or more letters and other writings, it is sufficiently proved.    (p. 780.)

6. In ascertaining the meaning of such writings the court will, if necessary, look to the surrounding circumstances.    (p. 780.)

7. An express trust needs no consideration to support it.    (p. 782.)

*Quære.* Is sec. 7 of the English statute of frauds, although in terms omitted from our statute, substantially in effect in this State, and can a trust like that shown in this case be proved by parol evidence?

8. A decree although erroneous will not be reversed unless to the prejudice of the party complaining thereof.    (p. 782.)

9. After a party has denied an express trust, in a suit to have the trust declared, and after the trust and the terms thereof are in writing proved to the satisfaction of the court, it is proper to put the trust property into the hands of a receiver.    (p. 782.)

Johnson, President, furnishes the following statement of the case:

The plaintiffs filed their bill in March, 1882, in the circuit court of Wood county against Z. Warner, W. H. Wolfe and Samuel Stewart.    The bill alleges, that J. B. McCandless was the owner of one undivided half of oil-lease No. 58 at White Oak in said county, and that afterwards Susannah McCandless, the wife of said J. B. McCandless, sold her house and lot in Parkersburg, her own separate property, and bought the other undivided half of said lease; that the property was valuable for the petroleum thereon, which was of a superior grade; that in operating said oil-lease defendants had incurred debts, for the payment of which on January 9, 1876, they executed a deed of trust to Samuel Stewart, trustee, conveying said leasehold property.    The debts to be secured are mentioned in a schedule attached to

said deed, and amount to about $2,500.00; the said debts before the sale under said trust amounted to about $1,200.00.

Complainants had great confidence in Rev. Z. Warner, who was pastor of the United Brethren Church in Parkersburg, of which they were members, and especially did the complainant Susannah McCandless so confide in him and a short time before said sale sought an interview with him, for the purpose of seeking his advice and suggestions, touchnig their financial troubles and threatening embarrassments. Complainants explained to him fully the situation of their affairs, and he expressed for them his profound sympathy, and promised to take their matters under advisement and do, if he could, something for their relief. At a subsequent interview with the Rev. Mr. Warner, he reported the result of his deliberations touching the premises, and said he could, as he thought, so manage, as to save to complainant, Susannah Mc-Candless her half of said property, and expressed himself particularly anxious to do so inasmuch as the debt for which her property was liable was not a debt of her contracting. He then proposed to become the purchaser himself at the trust-sale, and to buy in one half of the property for and on behalf of said Susannah McCandless. He told Susannah that he could get Bro. D. Needham, who was mentioned in the schedule, and whose debt amounted to $385.00, to wait for his debt for a time; that he had already arranged with W. H. Wolfe, or with Wolf & Stewart, to take one half of the said property which he proposed to bid in in his own name, provided the property did not sell for more than $1,000.00; that with one-half the purchase-money he could pay off nearly all the residue of the debts; that said Susannah corresponded with said Needham, who was a friend and member of the same church, and he agreed to wait for his money six, twelve and eighteen months, and accordingly such arrangement was made, and Warner was to hold one-half of the property and pay off the debts, and then turn over the property to the said Susannah. Warner became the purchaser at $1,050.00 at the trust-sale made on the first day of August, 1877, and a deed was made to him, a copy of which is exhibited with the bill; and said Warner conveyed to W. H. Wolfe, or to Wolfe & Stewart, one undivided half of said property for the consid-

eration of $525.00, one half the said purchase-money; that at the sale of said property J. B. McCandless requested said Warner to postpone the sale for a week in order that he might find a purchaser who would pay more money for the property, and that Warner replied that Wolfe & Stewart had already agreed to take one half of the property if it did not go for $1,000.00 or a little more, and that he had already bid $50.00 more, and declared then and there that he was not buying the property for himself, but was buying one-half for Wolfe, or Wolfe & Stewart, and one half for Mrs. McCandless; that after said sale Warner, Wolfe and Stewart proceeded to work and develope said property, and have produced about 3,000 barrels of oil above the royalty and have sold the same at remunerative prices, at an average price of not less than $3.00 per barrel, one half of which belongs to the female plaintiff, after deducting expenses etc.; that some time after the sale said Warner professed to be acting in good faith and expressed his anxiety to have the property disencumbered from debt so that he could turn it over to the female plaintiff. That of the proceeds he has paid the female plaintiff about $300.00. The bill exhibits a number of letters which it charges were written by the said Warner with reference to said sale and management of said property, which are filed with the bill, marked one to fourteen, inclusive, except No. 12, written by Needham. The bill also sets out the substance of these letters.

The bill charges, that the property has paid the debt and expenses, and that Warner, the trustee, is largely indebted to the female plaintiff; that the facts and circumstances set forth in the bill constitute said Warner, trustee, for said female plaintiff; that he has refused to make an exhibit of his accounts and now denies that he is trustee for said female plaintiff. The bill makes the said Warner, W. H. Wolfe and Samuel Stuart, defendants and prays, that said Warner be required to answer and say how much oil has been produced from said lease No. 58 since the sale under the deed of trust, and show the monthly productions; that he furnish an accurate statement of the grades of the oil so produced and the amount of each grade; also an accurate statement of money actually expended in operating said well with the proper vouchers

therefor; also a statement of the sales of oil, to whom sold, the prices for each lot sold, and what he has done with the money; that he disclose how much of the Needham debt has been paid by him and when paid, and that he further state in what manner he has been acting toward said property, and for whose benefit he claims to have been acting, and further say how much oil is now on hand. The prayer of the bill further is that Wolf and Stewart in their answer say whether one half of said property, about the time of the sale under the trust-deed was not conveyed to them, and if so, why the deed was not recorded, and that they be required to file said deed with their answer, and also state the amount of oils received by them from said lease, the grade, to whom sold, and at what price, and what has become of the half belonging to the female plaintiff. The bill still further prayed that Warner be required to fully account for all moneys that have come to his hands by virtue of the premises, and be required to turn over the same together with one half of said leasehold property to the female plaintiff, and that a receiver be appointed to take charge of said property, that is, one half of said leasehold property and all that property connected therewith claimed by said Warner; and for general relief.

Such of the said letters exhibited with the bill as we think material in the decision of this cause are here inserted. No. 1 was written on the seventh day of August, six days after the day of sale, and was written to Mr. Needham, one of the creditors, to get an extension of time on the debt due him. The letter is as follows:

"Parkersburg, W. Va. Aug. 7, 1877.

"D. Needham, Esq.:

"My Dear Friend:—The McCandless property has been sold under the trust, and I bought it in for $1,050.00; this is less than the debts amount to. I bought for the purpose of securing half the property for Mrs. Mack; the other half another party has taken. Now that all the debts may be paid, it is necessary to do two things: 1. Repair the old wells and bore a new one. This all can be done in three or four weeks. If we get a four barrel well, as we very likely will, and the price of oil continues as now, all the debts can be paid in less time than one year. If you desire it, we will

give you a mortgage on Mrs. Mc's half, you sending a release of the present mortgage.   The property is in the hands of a first rate business man who will get all out of it there is in it.   Hoping you will understand the state of the case and that I shall hear from you soon,

" I am yours truly,

" Z. Warner. "

" Parkersburg, W. Va. Feb. 8, 1879.

" D. Needham, Esq.:

" Dear Bro.:—Yours received; the reasons I did not write you sooner I was trying to sell some oil so as to send you some money, but the cold weather shut us up so that we could not deliver it, and now that we have sold, it is on 90 days time.   I will now tell you of a matter that I have not mentioned before for the reason that I wanted you, if possible, to get all your money.   It is this: The property sold for only eighty per cent. of the principal of the debts, and on that account no one has received more than $80.00 on the hundred; this would give you $300.00, or about that.   We intended if we could to pay the full amount; whether this can be done or not is an open question.   I have consulted Mrs. McCandless and we have agreed to propose this, and you can use your own pleasure as to accepting: I will borrow if I can $300.00 and give you for the note, and if the price of oil should ever improve so that Sister Mac can do it, she will pay you $75.00 more.   I make this proposition for two reasons:

" 1. I infer that you need your money very much, and I suppose that $300.00 would be worth more than $400.00 reaching out over eighteen months.

" 2. The price of oil is so low that it is doubtful in my mind whether we can get out inside of three years.   Now understand me, if you are not favorable to this, say so, and I will be entirely satisfied.   I want to do what will be best for all parties.   Please let me know what I shall do at once.

" Yours truly,

" Z. Warner."

Parkersburg, W. Va., Sept. 15, 1880.

"D. Needham, Esq.:

"My D'r Sir:—Yours received and contents noted, and cannot say I am surprised.   You likely misunderstood my

letter. I did not mean that you would not get more than $25.00, but I cannot say that any oil interest is "perfectly good for a hundred dollars or more." I might say that it would be likely to be good for that. When I wrote to you in 1877 what I did, there were several things I did not know:—1st, the power of oil rings to control the price of oil; 2d, that our oil would drop from $3.50 per barrel to $1.25 ; that we would have to bore a new well at a cost of $800.00; 4th, that notwithstanding this, our production would fall off one-third. In addition, I have paid nearly $300.00 to Mrs. Mc-Candless; if I had not paid her anything you would be paid. Yesterday her son was after me again for money; will you say now to me that I shall not give her any more until your debt is satisfied ? I will obey you ; or you come down and I will turn over the property to you and step out and let you manage it. The experience you will get will be valuable. The first lesson you learn, that six months of the year the property does not pay expenses ; we have 114 barrels of oil on hand ; we are trying to sell it ; when we do I will send you my share of the proceeds ; more than this I cannot do.

"Yours respectfully,

"Z. Warner."

"Parkersburg, W. Va., April 15, 1881.

"Sister McCandless :—I have been led to believe by statements coming to me from different sources that you are not only dissatisfied with but think I am dishonest in the management of this oil interest. How far these statements are authorized by you I have no means of knowing, and shall not pretend to determine, nor do I intend to make any denial of any things that may be floating among the people, except to say the most foolish thing I ever did in my life was to buy a run down oil property, $2,000 in debt, with the price of oil controlled by heartless capitalists, and hope to make any money inside of ten years ; again I do not feel that I have any right to expose myself to unkind criticism without any benefit to myself. You have received over $300.00 of money that you would not have received if I had not bought the property. Now one of two things will occur, either I must be free from unkind criticism or I will sell the property, finish. paying the debts and if there is any surplus left,

turn it over to you and have nothing more to do with it; in this matter I am determined.

"Respectfully Yours,

"Z. Warner."

"Chicago, Ill., April 26, 1881.

"Rev. Z. Warner, Parkersburg, W. Va:

"Your postal, April 22 received. My claim is of such a nature as justifies me in demanding from you an itemized statement of receipts and expenditures since you took possession of that property. I am not satisfied with the general statement which you make, but want something specific. What I have done with reference to my claim by way of extension of time was done for the purpose of benefiting Mrs. McCandless and for no other purpose. This fact gives me a right to know whether or not she as well as myself are being fairly and honestly dealt by. The time has come when this matter must be satisfactorily adjusted or I will seek my remedy in the courts.

"Yours truly,

"D. Needham, G. S. N."

"Parkersburg, W. Va., May 6, 1881.

"D. Needham, Esq.:

"Dear Sir:—Yours of recent date received. You seem to think that I am both dishonest and untruthful; this is your privilege. I have no authority to give you an itemized statement of the business of a company. What I have decided to do is to borrow the money and pay you off and sell the property to get out of this trouble. I do not intend to be annoyed any longer. On the 9th instant, I start to Iowa; will be in Chicago the night of the 10th at the Briggs House; as soon as I return from this trip will close this matter out in the way I have stated.

"Yours as ever,

"Z. Warner."

Z. Warner answered the bill and among other things said:

"Respondent, for further answer, says that it is true he reported the result of his deliberations to Mrs. McCandless respecting said property and the indebtedness against it; respondent said to her that as she had joined her said husband in executing said deed of trust, he saw no way to save her

interest in said property; but it is not true that respondent said to her that he thought he could so manage as to save her half, nor did he express to her any reasons for so doing, as alleged in the bill, nor did respondent know what benefit, if any, complainant Susannah received from said oil property.

"Respondent denies that he ever proposed to the said Susannah to become the purchaser of her interest in said property at said sale or the interest of her husband for her benefit. Respondent had not in fact thought of buying the property until the day of sale, and respondent was not in a condition financially to purchase property without aid, and it was not until after the trustee had actually commenced crying the sale of the property that respondent saw his co-defendant, W. H. Wolfe, and in a conversation with him about the sale of the property learned that he would take a half interest in the property at the price of $1,000.00, and he finally consented to take a half interest if respondent would buy the property at $1,050.00.

"Respondent then went to the court house where the trustee was offering the property for sale at public auction, without having determined whether to bid on the property at all; but respondent did bid $1,050.00 for the property, and it was knocked off to him by said trustee at that price; and respondent did not mention to complainants, or either of them, either before or at the time of his purchase of said property, that he could or would purchase said property, or any part of it, or that he had any idea of such a thing. And responded did not before or at the time of or since said sale make any arrangement or have any understanding with the complainants, or either of them, that he would purchase or hold the said property, or any part thereof, for the benefit of the complainants, or either of them, and every such allegation contained in said bill, no matter in what form alleged, is hereby positively and emphatically denied.

"Respondent, soon after said purchase, at the instance of said W. H. Wolfe, assigned and conveyed a one-half interest in said property to said Wolfe and Samuel Stewart; the latter being an experienced oil producer, was induced by said Wolfe to take a quarter interest in said property, but some

years—since said Stewart sold his interest in said property to said Wolfe.

"Respondent, further answering, says that very soon after purchasing said property he told complainants of the arrangements he had made with said Wolfe and Stewart, and he told the female complainant that inasmuch as she had lost all her separate estate by investing in this oil property, respondent would do the best he could with the property to make it pay the debts, and that he intended that any profit which could be made out of the property should be given to her to aid her in supporting her family; that he did not purchase said property for the purpose of speculation or profit to himself but with the hope of being able to help her.

"Respondent was poor and had no money wherewith to pay for said property and could not have bought it but for the aid of said Wolfe; that said Wolfe and Stewart took one-half of said property at $525.00 just what respondent bought it at, and respondent had to borrow the money to pay for his half. Respondent knew that said D. Needham, who was one of the largest creditors secured by said deed of trust, was a warm personal friend of the complainants, as well as of this respondent, and he thought said Needham would be willing to wait for his money, which would save respondent the trouble of borrowing it of some one else to pay him; and under these circumstances respondent requested said complainants to ascertain if the said D. Needham would not wait for his money until he could realize the money out of the proceeds of the oil produced from said property, and the said Susannah corresponded with him, and the said Needham agreed to wait for six, twelve, and eighteen months; but, as respondent has before stated, this conversation was had with the said Susannah after he had purchased the property; and respondent here repeats his denial that there was any arrangement between him and the said Susannah, expressed or implied, whereby he was to purchase the property and hold the same for her use and benefit, as alleged in the bill, nor that when he should have paid off the debts against the property, that he would then turn over the alleged half interest to her. Respondent told the said Susannah that if he was successful in paying off the indebtedness against the property—knowing as he did the

destitute circumstances of herself and family—that he would aid her as he could from the profits of the property, and respondent says that he has kept his promise in this respect in every particular, as will be more fully shown hereafter."

He denies the alleged conversation with J. B. McCandless at the sale. He denies that he stated to divers persons or to any person, that he had no interest in said property except as trustee for the female plaintiffs, and then proceeds as follows :

"Respondent answers that he has always acted in good faith towards complainants; that he expressed anxiety, it may be to have the property he bought relieved from debt, but not for the reason alleged in the bill that he might turn over to said Susannah any portion thereof, and which he had never agreed to do.

"It is true, as alleged in complainants' said bill, that respondent has given to said Susannah, out of the proceeds of said oil property, divers sums of money, amounting in the aggregate to about the sum of $300.00, as he told the said Susannah after he bought the said property he would do if he could get the debts paid which he had assumed in buying the property, and respondent says that he has always held out to the said Susannah his intention to assist her as he could out of the proceeds of said property, and had when he bought the property, and now has, great sympathy for her ; and respondent now professes himself as willing and intending to observe his charitable intention, as expressed to said Susannah, to give her such sums as he could out of the profits derived from said property, if any profits could be made, and respondants whole desire and intention was, when he made up his mind to buy the property, that by doing so he might be able to aid the said Susannah by giving her some of the proceeds if any there could be saved out of said profits.

" Respondent says also that if he had not bought said property, the said Susannah would not have received the $300.00 which he had voluntarily given her, or anything else from said property ; and if he had not incurred great risk and responsibility in putting down a new well, said property would never have paid the debts against it and said Sus-

annah would not have received the aid she has had from respondent.

"Respondent says that he undertook to pay off the Needham debt in six, twelve and eighteen months, but he denies that he undertook to do so for complainant, Susannah, under the arrangement alleged in the bill, and respondent believes that he would have been able to do so if he had not at the instance of said Needham, and with his consent, let Mrs. McCandless have various sums of money, as respondent had informed said Needham that when the debts against said property were paid he intended to help Mrs. McCandless out of the proceeds of sales of oil produced on said property if anything could be made; and respondent says that he did let her have at various times small sums of money, amounting in all to about $300.00, as herein alleged, and some of these sums he paid her out of his own pocket and when he had no money derived from sales of oil with which to give her any assistance. It is true, as alleged in complainants' bill, that he had a correspondence with said D. Needham in reference to his said debt, and that he wrote the letter of August 7, 1877, but respondent says that it was a confidential communication between him and said D. Needham, and was in answer to a letter from said Needham to respondent, and was intended to express respondent's private purpose which he entertained at the time he bought said property, and still entertains, to aid Mrs. McCandless out of the proceeds thereof, and of which respondent is advised the complainants can take no advantage either at law or in equity. Respondent says that in his reference to Mrs. Mac.'s half, he used the language as a convenient reference to the proportion of said property which he had retained himself in making a sale to his co-defendants Wolfe and Stewart, and as responpondent knew he could better indicate to said Needham what proportion he proposed to mortgage. Respondent denies that he ever regarded himself, and he denies that any of his letters indicate that he regarded himself, as the agent of said Susannah or as acting for her in relation to said property.

"Respondent answers that the law of which complainants are advised respecting confidential relations, he is advised is

good law; but he denies that he in any respect sustains any confidential relations to said Susannah or J. B. McCandless; and he denies that there is any contract between himself and complainants; and he denies that said complainants ever placed any such confidence as they charge in respondents, or that he has taken advantage of them in any respect or that they have been enjoined or prejudiced thereby. Respondent does not claim to own any interest in said property except what he bought at said sale and reserved in his sale to said Wolfe and Stewart; and he denies that said Susannah has any interest therein, or the proceeds thereof, or that he ignores any rights whatever of complainants, therein; for respondent answers that they have no rights or interest therein whatsoever. Respondent denies that complainant, Susannah, has any interest in said property or the profits thereof; and he denies that the expenses of operating said property have all been paid. It is true the Needham debt has been paid, and that the money respondent borrowed, as he has before answered, has been paid, and that all the royalty oil has been paid, but respondent has been obliged to borrow $150.00 to discharge the Needham debt and the original loan for the payment of the purchase-money, which still remains unpaid. Respondent denies that he is in any manner indebted to said Susannah. He denies that he has perpetrated any fraud upon her rights, or that he has fraudulently with-held from her any sums of money belonging to her from proceeds of said oil property or otherwise. Respondent denies that he is or can be in any way constituted agent or trustee of said Susannah, as alleged in the bill, or that he ought to be required to make any exhibit of his private affairs to her; and he denies that he has committed any fraud in not doing so."

He files an account of the production and sales of oil, expenses, &c., the conclusion of which is here inserted:

| "1879. | Brought forward. | | | $6,379 99 |
|---|---|---|---|---|
| Aug. 6—Sweetzer Oil Co,..................bbls. | 99.74 | $124 68 | | |
| Nov. 17— " " " .................. " | 94.56 ⎱ | 458 62 | | |
| " 25— " " " .................. " | 53.12 ⎰ | | | |
| | | 202 50 | | |
| | | 165 00 | | |
| | | | | 950 80 |

Am't rec'd on oil sold of which defendants can-
not learn to whom it was sold, and of which
no account seems to have been kept..............          316 25
                                                    ─────────
                                                    $7,644 04

"EXPENDITURES.

"To gross amount for putting down new well
and other necessary improvements and ex-
penses...................................... ....................... $6,101 25
"To paid purchase-money and interest to date   1,157 20
"To coal bill not presented and unpaid............... 281 00
"To amount given to Mrs. McCandless............. 290 00
"To bills outstanding and due other than coal
bill........ .................................................... 219 00
                                                    ─────────  $7,948 55
                                                               ─────────
                                                               304 15
"Oil on hand in tank April 1st, 1882, 251 bbls."

W. H. Wolfe answered the bill; but Samuel Stewart did
not. A number of depositions were taken, and on December
23, 1882, the cause was heard on the bill, the answers of War-
ner and of Wolfe with general replication, and depositions
filed, and an issue was directed : "Whether or not the said
Z. Warner, the defendant, agreed to and with the said com-
plainants J. B. McCandless and Susannah McCandless or
either of them, that he would buy the oil-property in the bill
and proceedings mentioned at the trust-sale of the same, and
that he would hold one half of said property for the use and
benefit of the said Susannah McCandless, until he could out
of that half pay off the money borrowed to pay for the same
and other debts including the Needham debt, and then turn
the said one half of said property over to her." The issue
was tried, and on December 20, 1882, a verdict thereon was
rendered, that such agreement was made. Two bills of ex-
ceptions were saved to rulings made during the trial of the
issue. On January 2, 1884, a decree was entered in accord-
ance with said verdict, and the court held that when said Z.
Warner purchased said property, it was so purchased for the
female plaintiff Susannah McCandless and that he held one
half of said property in trust for the said Susannah McCand-
less, and that as such trustee he should be required to ac-
count, and referred the cause to a commissioner for such ac-
count to be taken.

From this decree the said Z. Warner appealed.

*Cole & Miller* for appellant.

*Loomis & Tavenner* for appellees.

Johnson, President:

The depositions show, that Warner many times stated, that he had bought one halt of said property for Mrs. McCandless. Mrs. McCandless in her deposition shows clearly and conclusively, that she wrote the letter of which Warner speaks in his answer, and sent it to Mr. Needham *before* and not after the sale, and exhibits the letter, which she says Mr. Needham handed to her to be used in this suit. She says: "The property was purchased by Dr. Warner to secure the one half for me. When I knew the property would be sold, I saw Dr. Warner and asked him if he could in any way secure my half for me. I told him I could take care of the Needham claim myself. On leaving he said he would see what could be done on the day of sale; and after the sale he told me he had bought the property to secure my half; said he would take care of it until the debts were paid, and then hand it over to me. I wanted him in some way to secure my half. I do not remember all the conversation, but I remember that distinctly, for that is what I wanted when I told him I would take care of the Needham claim ; he told me to write to Mr. Needham, and see if he, Mr. Needham, was willing to give me time. I wrote to Mr. Needham July 29, 1877, as suggested by Dr. Warner and file herewith, the original letter that I so wrote to be filed herewith as a part of my deposition, marked 'No. 1, Mrs. S. Mc.' I am not confident it was sent the day it was written, but it was sent before the sale ; he did not expect an answer until after the sale, but it was promptly answered, which answer was duly received, and was turned over to Z. Warner, in which he, Needham said he would give six, twelve and eighteen months, if the claim was secured. Dr. Warner read the letter and said it was all right." On cross-examination she says, that it was on the day of the sale, that Warner came to her and told her he had bought the property in to secure one half for her, and would take care of it for her, until it was paid for, and then would turn it over to her.

J. B. McCandless in his deposition says :  " On the morn-
ing of the sale, and after the property was bid to $1,000.00,
or about that, I asked Dr. Warner to aid me in having the
sale adjourned for one week, as there were parties present
who said it would require that length of time to get ready to
make the purchase of the property, stating they would bid it
to $1,600.00 or $1,700.00 if they got that length of time. Dr.
Warner answered in substance, ' I have made arrangements,'
or ' have a plan,' I do not remember which, ' by which I
expect to save Mrs. McCandless her half of the property,'
but answered further, ' I will see Mr. Wolf about getting the
sale adjourned.' He said, 'I have bid as high, or exceeded
the bid, they allowed me to bid, but if they are satisfied to
allow the sale to be adjourned, I am up to this.' I did not
know who was meant, other than Mr. Wolfe. After seeing
Mr. Wolfe he told me that he, ' Wolfe would not allow his
bid to stand if the sale was adjourned over for one week,'
but he, Warner, told me he ' would go with me to Mr. Stew-
art and see what he would do in the matter.' The sale now
being adjourned over nntil after dinner we went together to
see Mr. Stewart, (Mr. Samuel Stewart was the trustee mak-
ing the sale ;) on the way out to Mr. Stewart's together, I
learned that Mr. Wolfe and Mr. Stewart were the parties
who were going to take one half off Mr. Warner's hands, Mr.
Warner retaining the other half for Mrs. Mc. I mean by Mrs.
Mc. Mrs. McCandless. I learned of this arrangement princi-
pally from Dr. Warner himself. The conversation carried
on between Mr. Warner and Stewart, was to that effect, or
rather seemed to be understood. Shortly after the sale, it
may be the same evening of the day of sale, or shortly after
at least, Dr. Warner told me he thought that with the man-
agement of Stewart and Wolfe, he would be able to pay the
Needham claim, and the money he had borrowed to make
the purchase, within a year or thereabout, and turn over the
property to Mrs. Mc."

R. J. A. Boreman says :  " I was present at the sale. R. H.
Thomas and my father knowing from an advertisement in
the paper that the property was to be sold that day had talked
the matter over and concluded to purchase. A short time
after the bidding commenced, and both Mr. Warner and our-

selves had several bids, he came to where R. H. Thomas and myself were standing and requested us not to bid any more as against him as he was buying it in not for himself, but for Mrs. McCandless. We at once stopped bidding and upon the next bid which was his own the property was knocked down to him by Stewart at I think $1,035.00. * * $1,600.00 is what we concluded the property was worth, and to that amount we would have gone."

R. H. Thomas says: "I do not remember of such conversation having taken place in the presence of Dr. Warner. I got the impression from some one while the sale was still pending, that it was being bid off for the benefit of Mrs. McCandless, consequently stopped bidding. My impression was that I got that impression from McCandless. I am satisfied that I was not present at such conversation as detailed in said answer in the presence of Dr. Warner."

W. M. Evans says: "Dr. Warner told him, he purchased one half said property for the benefit of Mrs. McCandless."

To J. V. Mayhall, Warner said substantially the same thing.

C. W. Mayhall, Delia Landley, Ida May Mayhall, in their depositions say: That Dr. Warner in a meeting held in his church at Parkersburg, represented that some of the members refused to pay his salary, because he had oil property; he stated he had no oil property, and had not a foot of oil territory and had simply done for one of his members, what he would do for any of them under like circumstances.

E. W. Staples, clerk of the Volcanic Oil and Coal Company, in his deposition says, he had a conversation with Dr. Warner in the latter part of July, 1877; believes it was on the day the property was advertised for sale under the trust; the conversation took place at Volcano; the conversation was in reference to back royalty due on the lease; he wished to ascertain on what terms the Volcanic Oil and Coal Company would adjust the back royalty provided he purchased the property, as he proposed to purchase the property for the benefit of Mrs. McCandless; his recollection is that he said to him, that he should deliver to the company one third or one half of all oil produced, until back royalty, and royalty on current production was paid; he was also to have the

benefit of any rebates, to which he might be entitled. He also said that as soon as he received from the property what he might pay, he proposed to turn the interest over to Mrs. McCandless.

W. C. Stiles, general agent of said Volcanic Oil and Coal Company in his deposition says: "I had a conversation with Mr. Warner a few days after the sale; he visited me at my office for the purpose of arranging to get time to pay the royalty due on the lease at the time of the sale. I called his attention to the fact that the Volcanic Company was creditor to J. B. McCandless for coal furnished to the amount of about $150.00 and used upon said lease; he then explained to me the terms upon which he had bought said lease, saying that he had bought it for Mrs. McCandless, and that after re-payment to him of advances, one half interest was to revert to her. He promised to pay the Volcanic Company's claim for coal above mentioned, before making over said half interest to Mrs. McCandless. Upon this assurance from him, his application for easy terms on back royalty was acceded to."

W. H. Wolfe says that on the day of the sale, while the sale was in progress, Dr. Warner came to him and asked, if he would take an interest in the property, or buy a part of it. Witness told Warner that, if he bought the property, witness would take an interest with him in it, provided it did not go higher than $1,000.00. After the sale he came to witness and said he had bought the property for $1,050.00. The excess was but small, and he took an interest, for which Warner made him a deed; says there was no arrangment made by him with Warner about purchasing said property before the day of sale."

The deed accompanying Mr. Wolfe's answer shows, that on the eleventh day of August, 1877, Warner, for the consideration of $525.00, then acknowledged to be paid, conveyed to Wolfe and Samuel Stewart an undivided half of said leasehold property.

In Warner's deposition he makes an unsuccessful attempt to explain his connection with said property on the theory that he did not buy the property for Mrs. McCandless. It is hard for him to explain the letter written on the seventh

.day of August to D. Needham consistently with his absolute truth and ownership of said one half of lease No. 58.   In his answer with reference to that letter, he says : " It is true as alleged in complainant's bill that he had a correspondence with said D. Needham in reference to his said debt, and that it is true that he wrote the letter of August seventh, 1877, but respondent says that it was a confidential communication between him and said D. Needham, and was in in answer to a letter from said D: Needham to respondent, and was intended to express respondent's private purpose which he entertained at the time he bought said property, and still entertains, to aid Mrs. McCandless out of the proceeds thereof, and of which respondent is advised the complainant can take no advantage, either at law or in equity.   Respondent says that in his reference to Mrs. Mac.'s half, he used the language as a convenient reference to the proportion of said property which he had retained himself in making a sale to his co-defendants, Wolfe and Stewart, and as respondent knew he could better indicate to said Needham what portion he intended to mortgage."

He would have effected quite as much by his truthful silence, had he not attempted an explanation of the letter of August 7, 1877.   As to the declaration in the church he makes this singular explanation in his deposition : " My recollection of times is different from that of others and I do not recollect the form of the statement I made.   I was trying to impress on the minds of my people that I needed my salary, having been informed by some of my stewards that some of the members seemed to think that I was getting money out of the oil-property.   If I made the statement in the form in which these witnesses say I did, it was because I had not put my own money in the property, intending the property to pay for itself, if paid for at all, and I did not consider it mine until it was paid for."

When asked if he had read the testimony of Stiles and Staples, and if he used the language stated by them in conversation, he said :   " At the time referred to by Mr. Staples I had no conversation with him at all, nor had I any conversation with Mr. Stiles in his office a few days after the sale, but some time in October as I now remember, after the new

well had commenced pumping oil, with Mr. Wolfe and Mr. Stewart I was in his office and made arrangements for paying the back royalty. Mr. Stiles claimed a coal bill of nearly $200.00, as being against lease 58, and intimated very strongly that he would give me trouble in court, if I did not make some arrangement to pay it; as a matter of economy, as I considered it, I gave him a verbal promise, that when the debts under the trust were paid, then, I would adjust that matter. I have no recollection of saying that I would not turn the property over to Mrs. McCandless until it was paid."

In answer to the question, whether at any time before the sale he promised to purchase the property for Mrs. McCandless, and whether he had any intention of purchasing the property in any capacity until the afternoon of the day of sale, and whether he had since that time said to her or any one else that he had bought the property for her and intended to turn it over to her when the debts were paid, he answered : " I had no thought or intention of buying the property for Mrs. McCandless or any one else, until after 12 o'clock on the day of sale according to the contract between Mr. Wolfe and myself. In the evening after I bought the property, I told Mrs. McCandless that I had bought the property and sold one half of it to Mr. Wolf; that while I should keep the other half in my possession, I intended to give her all the benefit I could, provided I could make the property pay its debts. There were no arrangements with her before the sale for me to buy the property for her." In that connection he further said that he had no knowledge of Mrs. McCandless asserting any claim to the property, since the sale, until she brought this suit. This statement does not agree with his letter to Mrs. McCandless dated April 15, 1881, above copied. He flatly contradicts R. J. A. Boreman and says further : " Mr. Boreman came to me,—I knew some one was bidding, —and asked me if I was bidding on the property. I told him I was. He said then he would not bid any more. I told him I hoped he would bid. That is the substance of it." Dr. Warner in this statement is not sustained by the facts and circumstances of the case, while Mr. Boreman's statement is so sustained. Boreman's statement is probable,

while Warner's is not. In answer to the question, whether Mrs. McCandless before the sale did not send for him, and whether he did not go and have a conversation with her, about her pecuniary embarrassments which involved the property, he answered : " She came to my house, and stated' that the property was advertised to be sold, and if sold she would lose everything that she had, and asked me if I could not help her in some way. I told her I thought I could, being under the impression, and not asking her, that she had not signed the trust, and said I thought I could save it to her. At her request I went to see Mr. Stewart, and in the conversation with him I learned that she had signed the trust. I then went to see her, and told her, that there was but one way that I could see to save anything and that was to get some friend who was engaged in the oil-business to run the property on the day of sale as far as possible above the debts."

It certainly would not take a very shrewd man to know, that a person's property was not in much danger of being lost under a trust-sale, if the party had not executed the deed of trust. Again if the brotherly suggestion to get some friend to run the property above the debts as much as possible, was really made, its hypocrisy becomes quite apparent, in view of the fact, that parties were there who would have given $1,600.00 for the property but were induced not to bid against Mr. Warner, because he represented that he was bidding it in for this same woman and *sister*, whom he says he was trying to befriend.

Being further asked the question, "Did you not propose to be that friend to buy the property for her. He answered, "No Sir." Further, "Did you consider yourself the owner of that property after you had bid it in." Answer, "I did, and as having a right to do as I pleased with it, and would not have bought it under any other consideration." This direct question was put to the witness :

"Did you not buy that property for and on behalf of Mrs. McCandless; and have you not publicly so stated on divers occasions, both orally and in writing ?"

He answered : "I bought the property with the thought in my mind, that if I could make it pay the debts, that I

would out of the after proceeds give to Mrs. McCandless such amounts as I could. I did not buy it as her agent."

The further question was asked him : "Did you not buy the property for Mrs. McCandless ?"

He answered : "I bought it for her in that sense, with the secret purpose that if I could pay the debts, that I would give her such benefits of the proceeds as I could, and I proposed after compensating myself for my trouble and expense, to give her such benefit as I could."

If a trust of the kind sought to be set up in the bill in this cause could be proved by parol, I would have no hesitation in saying that it is clearly proved in this cause, that Z. Warner after said sale held one half of said leasehold-property in trust for the female plaintiff, and that, when it was cleared of the debts, and the trustee compensated, it should be turned over to Mrs. McCandless. Whether a party who obtains a deed for valuable consideration, but agrees by parol with the grantor, at the time the deed is made, that he will hold the land in trust for third parties, can have such trust enforced in a court of equity is questionable. (*Troll* v. *Carter*, 15 W. Va. 567.) In that case the question was discussed, but not decided, as it was not necessary. The same question was alluded to and somewhat discussed in *Tichenell* v. *Jackson & Feather*, *supra*, 460, but was again waived, as its decision was not necessary for there was a written agreement between the parties. The agreement was somewhat vague, but with the surrounding circumstances it was held to mean, that the purchaser at the sale, held the land so purchased in trust for the former owner. In that cause we held that if a conveyance be made by A. to B., and at the same time and as a part of the transaction B. executes a writing wherein he declared he purchased the land in trust for E., this constitutes an executed, an express trust and is valid, though C. gave no consideration whatever for being thus made *cestui que trust*.

In *Troll* v. *Carter*, 15 W. Va. 567, the *quære* was propounded : Does the omission in our statute of sec. 7 of the English statute of frauds have any effect? That *quære* we will not answer in this case, but will treat the cause as if the said seventh section were in full effect in this State. The instrument in writing required by the statute may be in terms less

formal than would be required for the creation of a trust, and the making of it is to be regarded as an entirely independent transaction. It has been held that it may be executed subsequently to the creation of the trust, or even in anticipation of it; or it may be executed subsequently to the death of the grantor. (Browne on the Statue of Frauds, sec. 97.) Letters under the hand of the trustee, distinctly referring to the trust are sufficient manifestations or proof to satisfy the statute. (Browne on the Statute of Frauds, sec. 98.)

In *Sture* v. *Stijre*, 5 Johns. Ch'y 1, cited by counsel for appellant, it was held, that a trust need not be created by writing; yet to take the case out of the statute of frauds its terms and conditions must be clearly manifested and proved in writing under the hand of the party to be charged. In that case the trust was sought to be proved by letters, but the court held them too vague and indefinite to prove the trust.

In *Forster* v. *Hale*, 3 Ves. 696, it was held, that the statute of frauds requires not that a trust shall be created by writing, but that it shall be proved by writing which may be subsequent to the commencement of it. When letters are to raise a trust there must be demonstration that they relate to the subject. In that case a trust was proved by letters, which it seems to me, were much more vague and indefinite than the letters relied on here. This case was affirmed in 5 Ves. 308.

In *Deg* v. *Deg*, 2 P. Wms. 412, it was held, that where A. receives a sum of money, which he covenants to lay out in land to be settled for certain ones, and afterwards purchases an estate, which he does not settle, but does by writing own that this purchase was made with the trust money, this binds the estate and is a declaration of trust.

In *Wilford* v. *Beazley*, 3 Atk. 503, it was held that where there is a complete agreement in writing, and a person who is a party and knows the contents, subscribes it as a witness only, he is bound by it, for it is a signing within the statute.

In *Smith* v. *Mathews*, 3 D. G. F. & J. 138, it was held that when the court is called upon to establish, or act upon a trust of lands it must not only be manifested and proved by writing signed by the person enabled by law to declare the trust, that there is a trust, but it must also be manifested and proved by writing signed as above what the trust is. In

that case it was held that the letters and other writing were insufficient to declare the trust.

In *Hutchinson* v. *Tindall*, 2 Green ch'y. 357, it was held that a declaration of trust requires no formality, so that it be in writing, and have sufficient certainty to be ascertained and executed; and it is not material whether the writing be made as evidence of the trust or not. That where a deed is absolute on its face, and without any actual consideration paid, if the grantor seeks to. set it aside on the grounds of fraud, the answer of the defendant setting up a trust, unless directly responsive to the bill, will not be evidence of the trust; but where the grantor files his bill, claiming the deed to be a deed of trust, and the defendant by his answer admits it, the answer, it seems, will be good evidence of the trust, and a sufficient writing to support it.

Where a firm which had an account against A. B., brought an action and received judgment thereon, and land of A. B., was sold under the execution and bid off by W. F., one of the partners in his own name, but with an understanding between him and his partner that he "should account with them for the interest in the land at its reasonable value;" and on the account of A. B., in the book of the firm, the expenses of the action and sale were charged and the rents of the land credited to the partnership. On the dissolution of the firm C. S. to whom the firm was indebted, requested the partners to convey the land to him in discharge of his debt. W. F. wrote in the margin of A. B's. account in the firm's ledger. "To W. F. he to pay C. S." and the other partners assigned to C. S. in writing their interest in the land. The accounts between the partners were afterwards settled. Held on a bill in equity filed by C. S. against W. F. to compel him, W. F. to convey the land to C. S. that there was no trust on the land in the hands of W. F. in favor of the other partners, or of C. S. *Homer* v. *Homer*, 107 Mass. 82, Morton J. for the court said: "The memorandum on the ledger of the firm is entirely insufficent as a declaration of trust. It does not describe the land; if it is deemed to refer to the land, it does not indicate an intention to hold it in trust; but the more natural import of its language is that the defendant is to hold the land as his own, and pay the plaintiff for his services."

A. conveyed his land to B., to whom he was indebted, by an absolute deed, and B. at the same time promised orally to convey or pay to A. any surplus that might remain of the estate or its proceeds after discharge of the debt. B. afterwards told A. that he had made a memorandum to the same effect but never delivered it to him. On B's death there was found among his valuable papers, a writing, signed by him not addressed to any person by which he " did agree and bind " himself to pay the above mentioned surplus to A. Below this writing was the following, also signed by him : " This memorandum is made for the use of my executor or administrator only ; A. has no legal or equitable claim against me or my estate, but on payment of my debt, any balance shall enure to A's benefit." *Held*, that there was a declaration of trust in writing within the meaning of the statute. ( *Wrann* v. *Coats*, 109 Mass. 581.)

*Barrell* v. *Joy*, 16 Mass. 221, was an appeal from probate, in which the probate court had passed a decree directing Joy to render an account as executor of the last will of Joseph Barrell, deceased father of complainants. In his capacity as executor Joy had charged himself with but a small amount of property, claiming to hold all the residue of the estate and effects which were once his testator's as his own estate and property by virtue of conveyances and assignments made to him by the testator in his lifetime, for a valuable consideration. The complainants contended that the property was assigned by the testator, and received by Joy under a confidence and trust between the parties; that after indemnifying Joy for all his lawful claims upon Barrell, on account of debts paid and liabilities assumed for him, the surplus if any should be accounted for to Barrell; and that they as his heirs were now entitled to call him to account, in order that he might be charged, as executor for any balance remaining in his hands. The conveyances of the property from Barrell to Joy were absolute; and it did not appear that there was any bond, covenant, or other declaration in writing, made at the time and tending to show the purpose and intention of the parties to the transaction. But to prove Joy to have received the conveyances in trust, the complainant relied on an indenture made in the lifetime of the testator, and after the said

conveyances, between Joy on the one part, and Jones, Jeffrey and Barrell on the other part, in which Joy covenants to sell sundry of the estates so conveyed to him, and appropriate a certain part of the proceeds thereof to the discharge of certain claims of the said Jones and others against Barrell. They also produced with the same intent a pamphlet printed and circulated by Joy in answer to one issued by the complainants, in which Joy alludes to the original conveyances as made to him in trust for the testator.      Parker, C. J., said :

"The conveyances and assignments were on the face of them, absolute and unqualified; so that, if a trust was intended, it was of a most confidential nature, and exceedingly difficult of proof, if the trustee had chosen to stand upon his strict legal rights, and refrain from any subsequent act, which might show the true character of the transaction. But it seems to be settled by authorities cited at the bar, that any declaration in writing, made by the grantee or assignee of property, at any time after the conveyance, is competent proof that the property was to be holden in trust according to the terms of the declaration, within a fair and liberal construction of the statute of frauds; and that letters or other papers however informal are sufficient to constitute such declaration.      According to this principle we must consider the expressions used in the pamphlet published by Joy, in answer to one previously published by the complainants as amounting to an acknowledgment, that the estates and property which he received from Barrell were entrusted to him for certain purposes; and that he was accountable to Barrell for a just distribution of them, and for any balance remaining after the purposes of the trust were fully answered.   *   *   *   But there is in this case much more satisfactory evidence of the accountability of Joy, as trustee, than any which can be derived from confessions extorted by a direct call upon him before the public for an alleged breach of trust and moral duty. The indenture made in October, 1797, furnishes conclusive evidence that notwithstanding Joy's legal title to the property therein discribed there was a beneficial interest remaining in Barrell.      For it can not otherwise be accounted for that Joy should have consented to appropriate the proceeds, after satisfying his own debt to the payment of the large demand of

Jones, Jeffrey and Russell, against Barrell. The tenor as
well as the effect of that indenture shows very clearly that
Joy had taken an assignment of the property, solely with a
view to secure himself an indemnity for his advances on ac-
count of Barrell ; and that it was intended and expected by
the parties, that when Joy was indemnified, either by pay-
ment or by the proceeds of the property on a sale, Barrell's
right to the estate, or to the residue of the proceeds, should
revert to him. This is a sufficient declaration in writing,
for although not made to Barrell, it is available to him, or
his representative."

From the authorities we deduce these principles, that if a
party obtain a deed for property for valuable consideration
paid by him ; under sec. 7 of the English statute of frauds it
may be shown, that such party holds the property so conveyed
in trust for another ; that such trust need not be created in
writing but must be manifested and proved in writing by
the party enabled by law to declare the trust ; and such
writing must show both the existence of the trust and the
terms thereof ; the writing to prove such trust need not be
made at the time the trust is created, but may be made any
time thereafter, and it is not necessary, that it be addressed
to the cestui que trust or to any other person. Letters after the
creation of the trust written to any one, in which the trust
and the terms thereof are admitted and declared, are a suf-
ficient declaration' of such trust within the statute ; and it is
not necessary that the trust and the terms thereof shall all
appear in one letter or other writing, but if they can be
ascertained with reasonable certainty from a number of let-
ters, or from one or more letters and other writings, it is suf-
ficiently proved. In ascertaining the meaning of such writ-
ings the court will, if necessary, look to the surrounding cir-
cumstances.

Without at all considering the parol testimony in this
case, relating to the declaration of trust our right to consider
the same not being decided in this cause, we shall have no
difficulty under the principles above set forth to dispose of
this cause. Mrs. McCandless owned one half of lease 58
and her husband the other half. She with her husband exe-
cuted a deed of trust on the whole lease to Samuel Stewart,

trustee. The trustee, about the first of August, 1877, sold the property under said trust, and the appellant, Warner became the purchaser. A deed was made to him therefor. A short time afterwards he conveyed one undivided half of the said property, in consideration of $525.00, in hand to him paid, to W. H. Wolfe and Samuel Stewart. On the seventh day of August, 1877, he writes to D. Needham, who was one of the creditors, secured under the trust-deed, telling him that the property had been sold under the trust, and he had bought it for $1,050.00; that he bought it for the purpose of securing half the property for Mrs. Mac; that another party had taken the other half; that the property did not sell for sufficient to pay all the debts, but in order to pay all the debts the old wells would have to be repaired and a new one bored, which could be done in about four weeks. He further said to him: "If you desire it we will give you a mortgage on *Mrs. Mac's half*, you sending a release of the present mortgage." Again on the eighth of February, 1879, he wrote Needham another letter in which he told him that "the property sold for only eighty per cent. of the principal of the debts, and on that account no one has received more than $80.00 on the hundred; this would give you $300.00, or about that. We intended, if we could, to pay the full amount; whether this can be done or not is an open question. I have consulted Mrs. McCandless, and we have agreed to propose the following, and you can use your own pleasure as to accepting: I will borrow, if I can, $300.00 and give you for the note, and if the price of oil should ever improve so that Sister Mac. can do it, she will pay you $75.00 more." In the letter written September 16, 1880, among other things he said: "I have paid nearley $300.00 to Mrs. McCandless; if I had not paid her anything you would be paid. Yesterday her son was after me again for money; will you say now to me that I shall not give her any more until your debt is satisfied? I will obey you; or you come down and I will turn over the property to you, and step out and let you manage it."

To Mrs. McCandless he wrote April 15, 1881, complaining that he had heard as coming from her unkind criticisms; that she was not only dissatisfied, but thought him dishonest "in the management of this oil interest." He further says:

"I do not feel that I have any right to expose myself to unkind criticism without any benefit to myself. You have received over $300.00 of money that you would not have received if I had not bought the property. Now one of two things will occur, either I must be free from unkind criticism or I will sell the property, finish paying the debts, and if there is any surplus left, turn it over to you and have nothing more to do with it; in this matter I am determined." It is very clear from these letters and the surrounding circumstances, that the letters amount to a sufficient declaration of an express trust within the statute; and it is just as clear that that trust was, that Warner, the trustee, should pay the charges against the property by managing it, that is the one half and after this was done, give the property to the female plaintiff, or if he were compelled to sell it, to pay the charges thereon after a reasonable compensation to himself, the trustee, to give the surplus if any, to Mrs. McCandless the female plaintiff. It seems to me that in the settlement of his trustee accounts Warner should be made whole and allowed a reasonable compensation for his troubles. He has acted badly in denying the trust; but I can see no sufficient reason for denying him compensation and it is not supposed the court will refuse it on the coming in of the report. It was proper after he had denied the trust, to put the property in the hands of a receiver.

It is insisted in argument by counsel for appellant, that there was no consideration for the agreement, if one was made. It being an express trust it required no consideration to support it. (*Tichenell* v. *Jackson & Feather*, *supra* 460.) It is also insisted by counsel for appellant, that no issue ought to have been directed under the settled law of this State governing issues out of chancery. This is true. There was not such a conflict of evidence as made it doubtful, on which side was the preponderance. The bill set up such a trust substantially, as we have ascertained existed, and vouched the letters of Warner to prove it and its terms. The answer does not deny these letters, therefore the court ought not to have directed the issue, but should have pronounced substantially the decree it did render on the verdict of the jury, upon the proofs as they stood at the time the issue was di-

rected. But this is not an error, of which the appellant can complain, as it was not to his prejudice.

There is no error in the decree of the circuit court of Wood county, for which it should be reversed, and it is therefore affirmed.

AFFIRMED.